UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff and Respondent,

    v.

JASHUA BAPTISTA,

    Defendant and Movant.
_____/

No. CR 10-0050 PJH

**ORDER GRANTING MOTION TO VACATE SENTENCE**

Jashua Baptista, a federal prisoner who is serving a sentence imposed by this court, moves for an order pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and having considered the evidence presented at the evidentiary hearing on this matter, the court GRANTS Baptista's motion for the reasons set forth below.

**BACKGROUND**

On January 7, 2010, Baptista was charged with two counts of possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1), one count of conspiracy to distribute and to possess with the intent to distribute methamphetamine under 21 U.S.C. §§ 846 and 841(b)(1)(A), and one count of possession of methamphetamine with intent to distribute under 21 U.S.C. § 841(a)(1). On March 3, 2010, Baptista pled guilty to one count of possession of methamphetamine with intent to distribute. On May 26, 2010, the court

sentenced Baptista to the mandatory minimum 120 months in prison and pursuant to the government's motion, the remaining charges were dismissed.

Through his sentencing, Baptista was represented by two different attorneys. He was initially represented by Federal Public Defender Joyce Leavitt until February 3, 2010, at which point he fired her and retained the services of Adante Pointer, who represented him at the time of his guilty plea and sentencing.

Several months after his sentencing, and commencing on September 2, 2010, Baptista filed several letters and documents pro se, which he characterized as "motion(s) to set aside judgment under Federal Rule of Civil Procedure 60(b)(3)," among other things. On September 7, 2010, the court issued an order to show cause construing Baptista's "motion" as one for relief under § 2255.

Subsequently, Baptista filed several additional motions including a motion for appointment of counsel, a motion for an order postponing his designation and transfer from FDC Dublin pending resolution of his motion to vacate, a motion for return of property, and a second motion to set aside the judgment, as well as several letters. On September 22, 2010, the court issued an order acknowledging that Baptista appeared to be arguing that he was entitled to relief based on the ineffective assistance rendered by his retained counsel Adante Pointer. The court also noted that Baptista made a number of serious allegations against Pointer, including that he had engaged in fraud and coercion in procuring Baptista's guilty plea and that Pointer was inexperienced and incompetent in federal criminal matters. The court determined that a hearing was warranted.

The court ordered that new counsel be appointed for Baptista immediately and scheduled an evidentiary hearing. On October 14, 2010, current counsel, Josh Cohen, was appointed as counsel for Baptista. Subsequently, on October 18, 2010, Baptista conceded that he had waived his attorney-client privilege regarding those matters discussed with his prior counsel, Adante Pointer, and raised by his § 2255 petition. Following Cohen's appointment, on October 27, 2010, the government filed its opposition to Baptista's § 2255 motion, and a declaration from Pointer in support of its opposition. Baptista thereafter filed

a reply.

An evidentiary hearing was held in three sessions, the first occurring on November 4, 2010. At the conclusion of the final session on December 3, 2010, the court ordered that post-hearing briefs be filed summarizing and clarifying each party's position. The court has reviewed the post-hearing briefs filed by both parties.

**DISCUSSION**

**1.      Legal Standard**

Under 28 U.S.C. § 2255:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence. Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

The decision whether or not to accept a plea offer is a critical stage of the prosecution at which the Sixth Amendment right to counsel attaches. *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002). Therefore, the two-part test of *Strickland v. Washington*, 466 U.S. 668, 686 (1984), applies to counsel's ineffective assistance in advising a defendant to accept or reject a plea offer. *See Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985); *Nunes v. Mueller*, 350 F.3d 1045, 1051-53 (9th Cir. 2003) (rejecting attempt to limit *Hill* to acceptance of plea offer). First, petitioner must establish that counsel's advice was deficient, meaning it was not "'within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). In advising a defendant, "[c]ounsel cannot be required to accurately predict what the jury or court might find, but he can be required to give the defendant the tools he needs to make an intelligent decision." *Turner*, 281 F.3d at 881 (counsel who advised defendant to reject offer of 15-years-to-life was not deficient where evidence showed that petitioner informed of potential death penalty at trial, and counsel had allowed petitioner to think

3

about offer overnight); *see also Nunes*, 350 F.3d at 1053-54 (failure to accurately convey terms of plea offer).

To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Premo v. Moore*, 131 S.Ct. 733, 743 (2011) (quoting *Hill*, 474 U.S. at 59).

**2.    Motion to Vacate**

Baptista contends that he is entitled to relief based upon Pointer having provided ineffective assistance of counsel by advising him that he could receive a sentence of less than 10 years if he pled guilty pursuant to a negotiated plea agreement. Relying on *Hill v. Lockhart*, Baptista contends that Pointer's advice to plead guilty, including his repeated representation that a sentence of less than 10 years was possible notwithstanding the mandatory minimum, amounted to ineffective assistance of counsel and rendered Baptista's guilty plea involuntary. 474 U.S. at 56. To correct this misinformed and involuntarily entered guilty plea, Baptista requests that the court grant his petition and order "the government to permit [him] to withdraw his plea or release him from custody forthwith." Def. Post-Hrg. Br. at 2.

Baptista does not argue that Pointer failed to advise him of the ten-year mandatory minimum sentence that the charges carried, rather he argues that Pointer failed to make it clear that the ten years was unavoidable. Baptista testified that Pointer not only specifically said on more than one occasion that he could get Baptista a lower sentence, Tr. 97, 142, but that his actions and strategy suggested that he believed a lower sentence was possible.

Baptista makes five main arguments in support of his petition.[1] First, that Pointer was inexperienced in federal criminal matters and did not know what he was doing, at least initially. Second, that Pointer did not provide the documentary and audio discovery to

---

[1] At the hearing, Baptista's counsel, through his questioning and argument, suggested a number of ways in which Pointer's conduct fell below the standard for reasonably competent federal practitioners. In the post-hearing brief, however, Baptista's argument is limited to the grounds set forth below and the court has, accordingly, limited its consideration to these arguments.

4

Baptista for his review, and as a consequence, Baptista had to consider Pointer's advice without having directly reviewed the government's evidence against him. Third, that Pointer advised Baptista that they should take a number of steps to influence the court's sentencing decision, including submitting letters of support from Baptista and others and bringing Baptista's attempt at cooperating to the attention of the court. Fourth, that Pointer filed an objection to the presentence report suggesting that Baptista's attempt to cooperate was a basis for a downward departure, which itself suggests that Pointer believed that a motion by the government was not required for a downward departure based on substantial assistance. Fifth, that Pointer sought to assuage Baptista's anxiety about the potential sentence by advising him that Pointer's law firm had some sort of personal relationship with the court. Though he does not rest on this point as a basis for the relief he seeks, Baptista also notes that he was not provided with an opportunity to read the plea agreement in advance of his entry of a guilty plea. The court addresses each of these arguments in turn.

**A.     The Evidence**

    **I.     Pointer's experience and general competence**

With regard to Pointer's experience and the reason for his retention, the evidence at the hearing revealed that Pointer and Baptista had known each other for several years prior to Baptista's retention of Pointer in this case, approximately one month before Baptista entered his guilty plea. The two had mutual acquaintances, and Pointer had represented Baptista in two matters previously in state court.[2] At the time that Pointer was retained by Baptista for this case, he had prior experience with state criminal cases and with federal civil cases, but had no experience representing a defendant facing federal criminal charges. Baptista hired Pointer because he was unhappy with advice he was receiving from his appointed counsel, and because Baptista believed that Pointer could obtain a lighter sentence for him. Baptista testified that he fired his former counsel after talking to Pointer, and upon Pointer's advice that Baptista "not take any time" yet because they could

---

[2] The nature of those proceedings, and whether they involved criminal or civil matters, is still not entirely clear to the court.

5

get his sentence lower than what Leavitt was advising Baptista. Transcript ("Tr.") at 142. Baptista testified that Pointer advised him not to worry about the mandatory minimum ten-year sentence because "we will get it lower than ten years," and not to "look at ten like it's [actually] ten years." Tr. 97.

Pointer testified that during the course of representing Baptista, he consulted with other attorneys who had experience in federal criminal law matters. Tr. 173-187. He admitted that he did not always keep notes of his meetings and discussions with Baptista and regarding all of his work on the case. Tr. 19. However, Pointer testified that he met with Baptista at least ten to twelve times at the jail, and he produced documents from his case file at the evidentiary hearing which reflected that he reviewed the discovery in Baptista's case, and researched various sentencing issues and an entrapment defense that Baptista requested he investigate. Tr. 180-186; Govt. Exhs. 1, 2, 4, 5, and 7.

### ii. Discovery

There is no dispute that Pointer did not provide the discovery to Baptista. The only dispute is why. Pointer admitted that he received discovery in Baptista's case from Baptista's former counsel, Leavitt, which had been produced to her by the government. Tr. at 24. The discovery was comprised of documents and audio and video recordings. *Id.* at 25.

Pointer testified that Baptista told him that Leavitt had reviewed the discovery with him. Tr. 176. He testified that he discussed the discovery with Baptista, but that he never provided him with any of the discovery for his personal review. Tr. 24-25; 29-30; 185-86. Pointer testified that he "attempted" to provide Baptista with the discovery, but that Baptista refused to take it. Tr. 25. According to Pointer, Baptista was "pretty vague" regarding his reasons for refusing the discovery, but that it appeared that he did not want any other inmates, including his cellmate, to read or view the discovery. *Id.* at 26. He could not recall why he wrote "MP3 player" in his case notes, and was not in the market for a player for himself. Tr. 226-227; Def. Exh G. He admitted that Baptista may have requested an MP3 player at some point to listen to the audio discovery, but that he never provided Baptista

6

1 with one.

2 Baptista testified that he "definitely" asked Pointer for all of his discovery, but that Pointer "put him off," advising Baptista that he would "highlight" important portions of the discovery so that Baptista could better understand it. Tr. 92-93. Baptista denied telling Pointer that he didn't want a copy of the discovery out of concern that someone else would see it. *Id.* He testified that he had already discussed his case with his cellmate, and noted that there was nothing in his discovery to be embarrassed or protective about. *Id.*

Additionally, Baptista testified that he requested an MP3 player from Pointer on several occasions so that he could listen to the wiretapped conversations, noting that other inmates at the jail had MP3 players for that purpose. *Id.* at 94. Pointer, however, never provided him with an MP3 player, nor did Pointer ever listen to the audio discovery with Baptista. Tr. 95, 147, 150. As of the November 17, 2010 evidentiary hearing, Baptista testified that he still had never listened to the audio discovery or viewed the videotaped discovery. Tr. 147. He stated that because he never saw his discovery, he never really knew what kind of a case the government had against him. Tr. 156.

### iii. Advice to take steps to influence the sentencing decision

The court combines Baptista's third and fourth arguments. Pointer testified that at the time he commenced his representation of Baptista in this case, he believed that Baptista already had an understanding regarding his sentencing exposure based on Baptista's conversations with his prior counsel. Tr. 15. He also advised Baptista regarding the ten-year mandatory minimum sentence and how it worked in Baptista's case. Tr. 193, 216. Pointer testified that Baptista was not happy when he was advised of the mandatory minimum sentence, but that Baptista's statements to Pointer indicated to Pointer that Baptista understood that he was facing a minimum sentence of ten years. *Id.* at 194-95.

Pointer also told Baptista that unless the government was willing to give him a formal cooperation agreement, that bringing Baptista's cooperation to the court's attention was not automatically going to persuade the court to give him a sentence below the ten-year mandatory minimum. Tr. 70. He also testified that in response to the probation officer's

7

conclusion that no factors warranted a downward departure, he filed objections to the presentence report based on Baptista's cooperation with federal agents after his arrest. Def. Exh. D.

Pointer testified that in conjunction with the presentence process, he advised Baptista to obtain letters of support. Tr. 65-66. He testified that Baptista also wanted to write a letter to the court, and that he advised Baptista that he should include anything he wanted the court to be aware of in the letter. *Id.* Although Baptista wrote the letter, Pointer admitted that he reviewed and revised the letter, and typed it up and submitted it to the court for Baptista. *Id.* At no point did Pointer advise Baptista that his own letter or letters of support from others would be useless. *Id.* at 67-68. Pointer also did not advise Baptista that bringing his alleged cooperation to the court's attention would be useless. *Id.* at 68. Rather, he told Baptista that the court would take all of the information that he presented at sentencing into consideration. *Id.* At another point in the hearing he clarified that the letters of support were intended to persuade the court that a sentence of *more* than ten years was not warranted, given that the guideline range was 120 - 135 months. *Id.* at 206. Pointer testified that in the sentencing memorandum he filed on Baptista's behalf he requested a sentence of no more than ten years.

Baptista, on the other hand, testified that in advising him regarding how he could get a sentence of less than ten years, Pointer advised him to collect as many letters of support as possible from friends, family, and employees. Tr. 102. According to Baptista, Pointer also advised him that he should write a letter to the judge and explain to her that he was "a family man," and not "a big criminal," and that she may see that was the case and give him a lighter sentence. Tr. 103. Regarding Baptista's "cooperation," Baptista claimed that Pointer told him that it could get him a lighter sentence, and that at the sentencing hearing, Pointer would ask for some time in chambers to discuss "sensitive" issues with the judge. *Id.*

As a result of this advice, Baptista wrote his own letter, Def. Exh. E, which Pointer revised and submitted to the court. Def. Exh. F. Baptista also obtained approximately

8

twenty letters of support. He testified that these were in an attempt to follow Pointer's advice in hopes of getting a lighter sentence. Tr. 107.

Baptista testified that throughout the case - even after the court's advisement at the March 3, 2010 change of plea hearing - he continued to believe he could receive a sentence of less than ten years. *See* Tr. 105. He testified that he was unaware that Pointer had filed a sentencing memo on his behalf, or that the sentencing memo stated that he was requesting a sentence of exactly ten years. Tr. 111. Baptista also testified that prior to the filing of this motion, he had never seen the objections to the PSR that Pointer had filed on his behalf. Tr. 109.

Baptista agreed that the typewritten letter submitted with his sentencing memo, and signed by him, stated that, "[i]t is my understanding that I must be sentenced to at least 10 years given the statutory mandatory minimums." Def. Exh. F at 3. However, he denied writing that sentence, and suggested that it must have been added by Pointer at the time Pointer revised his handwritten letter, noting that his original letter did not contain that statement. Tr. 112-114; Def. Exh. E.

### iv.   Claim of a personal relationship with the court

Finally, Baptista argues that Pointer's claim of a personal relationship between his law firm and the court contributed to his belief that a lower sentence was possible. In his initial pro se filings, Baptista stated that Pointer told him that "I have Judge Hamilton in the bag. She will give us a sweet deal. Because John Burris [Pointer's boss] introduced her to her husband," and that Pointer promised that he "will receive a lighter sentence because the judge is our friend." Mot. To Set Aside Judgment, Docket No. 68, September 9, 2010. At the hearing Baptista testified that when he was discussing his retention of Pointer, Pointer advised him that he "had an inside line" to the judge because John Burris introduced Judge Hamilton to her husband. Tr. 91-02. Baptista testified that Pointer advised him similarly on several other occasions. *Id.* According to Baptista, Pointer suggested that as a result of his connections with the court, he could get Baptista less time and that Baptista "would have nothing to worry about."

9

Baptista testified that he "took Pointer's word," and "put [his] trust in Pointer" that he could get him a sentence of less than ten years. Tr. 127. He stated that in light of Pointer's statements, he always believed that the judge could impose a sentence of less than ten years. Tr. 98.

Pointer admitted that he told Baptista that the judge had been introduced to her husband by someone at his law firm – not John Burris but Miles Washington. Tr. 60. He testified that he relayed this information to Baptista in an effort to "humanize" the experience and the judge because Baptista was very anxious and had heard that the judge was a "monster or a bitch." *Id.* He claimed that he didn't make any statements to Baptista regarding the judge to suggest that he would get any favors or special treatment, but instead to convince Baptista that the judge was fair. Tr. 60-61.

### v. Switch of plea agreements

Regarding the plea agreement itself, Baptista pled guilty to one count of possession of methamphetamine with intent to distribute under 21 U.S.C. § 841(a)(1). However, at the evidentiary hearing, Baptista claimed that he had not seen or discussed the plea agreement pursuant to which he pled guilty until he was in the courtroom at his March 3, 2010 change of plea hearing. Tr. 100. Just two days prior to the hearing, on March 1, 2010, the government faxed Pointer a plea agreement, which provided for a plea to conspiracy to possess with intent to distribute methamphetamine under under 21 U.S.C. §§ 846 and 841(b)(1)(A). Def. Exh. I.[3]

Baptista testified that the March 1, 2010 plea agreement to conspiracy was the one that Pointer discussed with him at the jail prior to his plea hearing. Tr. 120. At the March 3, 2010 hearing, he believed that he was pleading guilty to conspiracy. Tr. 100. He reminded the court that the recess that had been taken at the commencement of the hearing was necessitated by his confusion about the different plea agreement. Tr. 100-102, 126. Baptista testified that the March 3, 2010 agreement had been "switched up" from the one

---

[3]That same day, the government also submitted that plea agreement to the court, with a letter that it was the proposed plea agreement for the March 3, 2010 hearing. Def. Exh. I.

10

that he previously discussed with Pointer. *Id.* Baptista testified that Pointer convinced him that he should in fact go ahead and plead to the possession charge rather than the conspiracy charge because a conspiracy guilty plea could implicate his wife.[4] Tr. 100. Baptista testified that he followed his attorney's advice and pled guilty to the possession charge, but that he did not read the plea agreement before he signed it, Tr. 97-100, 126.

Pointer's testimony corroborated Baptista's testimony on the switching of the plea agreement to a large degree. He admitted that just two days before the hearing, the plea agreement that he negotiated and discussed with Baptista was to the conspiracy charge, and that the agreement Baptista actually entered into was not the one that he had discussed with Baptista at the jail. Tr. 237. Pointer admitted that there was a difference not only in the charge but in the recitation of the background facts. Tr. 244.

Pointer, however, testified that it was Baptista who had vacillated regarding which charge he wanted to plead to, and noted that the draft agreement the parties initially negotiated contained a guilty plea to both the conspiracy and possession charges. Tr. 45-48; Govt. Exh. 2. Pointer asserted that through negotiations with the government, he was able to get the government to agree to a plea to only one count. Tr. 190.

**B.    Findings of Fact/Conclusions of Law**

The court is familiar with Pointer, his having appeared on several civil matters on this court's docket. The court has always found him to discharge his responsibilities on his civil cases in a satisfactory manner. Every attorney has to start somewhere and even though Baptista's case provided "on-the-job" training, Pointer's file notes reflect that he ultimately negotiated a plea agreement containing significant benefits to Baptista. The court rejects Baptista's argument that Pointer's lack of federal criminal experience somehow gives rise to an inference that he was ineffective. However, there were lapses in his judgment that bear on the court's determination.

Starting first with the discovery issue, a failure to provide discovery to a client who

---

[4] The government established at the hearing that this was not true, and Pointer denied on direct examination ever making such a statement. Tr. 51.

11

has not requested it or otherwise shown any interest in receiving it, does not, in the court's view, amount to ineffective assistance of counsel. However, a failure to provide discovery to a client who has specifically asked to see it, is clearly not an acceptable way of representing a criminal defendant facing a ten year prison term. Thus the court is compelled to determine whether Baptista did or did not request his discovery.

With regard to whether he requested an MP3 player, Baptista's testimony is credible that he did so and Pointer does not recall. However, Pointer's case notes in which he referenced "MP3 player," the device routinely used by inmates to listen to audio evidence, suggest that Baptista did in fact request the device which Pointer admittedly did not provide. It is no leap for the court to conclude that if Baptista requested an MP3 player, thereby exhibiting an interest in the discovery, he probably also requested to see the documentary discovery as well. In view of the notes which corroborate Baptista's testimony, the court finds Baptista's testimony more credible than Pointer's on this issue. While Pointer's failure to share the discovery with his client does not alone establish deficient performance, it is certainly an omission that the court cannot ignore in determining the adequacy and effectiveness of his representation.

With regard to the strategy that led Baptista to believe that he could receive a sentence of less than ten years, the court finds that Pointer's testimony reflects that he currently has an accurate understanding of the mandatory nature of the ten-year sentence and of how departures based on cooperation work. Whether he had a clear understanding when he undertook representation of Baptista is not so clear. Given that Pointer's case notes reflect a discussion with Baptista about a potential sentencing range of 9 – 11.5 years, it appears to the court that Pointer may not have always understood that ten years was the floor. However, the court is entirely unpersuaded by Baptista's argument that Pointer's advice regarding the letters of support and cooperation somehow reflect incompetency, because such efforts were futile in the face of the mandatory minimum. In the experience of the court, competent counsel frequently submit letters of support and advance mitigating factors for exactly the reason Pointer says he did – to dissuade the

12

court from rejecting the plea agreement or from sentencing at a higher point within the guideline range or above it. It is particularly important for counsel to do so in situations where a defendant has prior drug convictions, which may in the court's view warrant a higher sentence, and where the plea agreement is pursuant to Rule 11(c)(1)(A) and (B) instead of 11(c)(1)(C), and is, therefore, non-binding on the court, as was the case with Baptista's agreement.

It is difficult to make a definitive finding as to what exactly Pointer told Baptista about whether the ten-year mandatory minimum was unavoidable or as to when during the course of their relationship he may have advised him of such. Baptista testified that Pointer told him he could get him less than ten years from the very beginning and repeatedly during the relevant time period. While the court has no trouble believing that Pointer may indeed have said something to that effect when trying to persuade Baptista to retain him and before he knew much of anything about the case, the court has difficulty believing that Pointer persisted in such representations after he received the discovery and started working on the case. The mandatory minimum sentence has a very prominent place in federal sentencing and it is inconceivable that Pointer did not, at some point before sentencing, understand the significance of it. The court finds Pointer's testimony more credible than Baptista's on this issue. That said, however, Pointer's strategy with respect to the letters of support and cooperation could certainly have led Baptista to persist in an earlier-formed belief that a lower sentence was nonetheless possible.

Lastly, although Baptista toned down his original assertion that Pointer claimed that he had the "judge in the bag," the import of his hearing testimony that Pointer claimed to have an "inside line" is nonetheless the same. Baptista understood the reference to be one suggesting that he might receive some special consideration because of the personal relationship between his counsel's firm and the judge. Although Pointer denied saying anything about having a special relationship with the judge, he admitted telling a client that he had personal information about the judge, information that may suggest that perhaps the judge was beholden to his law firm. Although Baptista initially appeared to argue that

13

1  this information was relayed to him to induce him to enter a guilty plea, the court finds,
2  based on Baptista's hearing testimony, that Pointer relayed this information to Baptista in
3  the course of attempting to persuade Baptista to retain his services.  In terms of the
4  significance of this conduct, Baptista argues that "reasonably competent counsel do not
5  invoke personal connections to a judge as a basis for reassuring an anxious client."  Def.
6  Post-hearing Br. At 6.  While the court does not find that the conduct alone establishes
7  ineffective assistance, it certainly evidences poor judgment and may even be a violation of
8  counsel's ethical responsibilities to his client and to the court.

9  In sum, the court finds that Baptista did initially tell Pointer that he could get Baptista
10  a lower sentence than what had been represented by prior counsel and further that he told
11  or intimated to Baptista that his firm had a special relationship with the court.  Baptista's
12  testimony as to these two points is corroborated by the fact that he fired his prior court-
13  appointed (free) counsel, Joyce Leavitt, who is both experienced and well-respected, to
14  hire (for a $10,000 retainer) a relative novice with no federal criminal experience
15  whatsoever.  While Baptista may well have advised Pointer later on that the ten-year
16  minimum was mandatory, Baptista was already fixed on the notion that there was still a
17  possibility that he could get a lower sentence.  Pointer's failure to provide discovery may
18  have also contributed to Baptista's misunderstanding.  Had Baptista had an opportunity to
19  hear his own wiretapped conversations negotiating drug transactions, he may better have
20  appreciated the seriousness of his predicament.

21  In a recent Ninth Circuit decision, the court made it clear that it is counsel's job to
22  ensure that his client understands "the actual consequences" of pleading guilty.  *Briseno v.*
23  *Woodford*, 2010 WL 5230897 at *2 (9th Cir. 2010).  The *Briseno* court noted that a guilty
24  plea is unconstitutional if the defendant was "so gripped by . . . hope[s] of leniency that he
25  did not or could not, with the help of counsel, rationally weigh the advantages of going to
26  trial against the advantages of pleading guilty."  *Id.*

27  Based on the evidence before it, the court finds that Pointer did not ensure that
28  Baptista understood the unavoidable nature of the mandatory minimum sentence.  The

14

court is persuaded that Baptista believed during the entirety of the time he was represented by Pointer that he could conceivably receive a sentence of less than ten years. Additionally, the court finds that Baptista's misunderstanding was not corrected by the court's advisement at the plea hearing, because as Baptista points out, that advisement was uncommonly muddled.  Lastly, the court is also bothered by the last minute switch of plea agreements; the operative agreement being one that Baptista did not have an opportunity to read.  The totality of the circumstances leave the court with the sense that we can do better.  No criminal defendant should be sentenced to a ten year prison sentence, pursuant to a plea agreement that the defendant has not read or does not completely understand.  Accordingly, the court finds that Baptista's plea was not voluntarily and intelligently entered.

As for prejudice, the court cannot conclude that the above deficiencies did *not* contribute to Baptista's decision to plead guilty.  Baptista himself testified several times at the hearing that he would have proceeded to trial, notwithstanding the severe consequences that might befall him in the absence of a plea agreement, if he had known that the ten years was unavoidable. Tr. 115.

For all of the above reasons, the court GRANTS relief on Baptista's § 2255 claim.

**C.    Relief**

As noted above, Baptista requests that the court grant his petition and order "the government to permit [him] to withdraw his plea or release him from custody forthwith." Def. Post-Hrg. Br. at 2.  First of all, it is up to the court not the government to permit Baptista to withdraw his guilty plea pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B).  Secondly, a motion to vacate a sentence is not generally resolved by a release from custody.  The cases cited by Baptista in support of his requested relief, are habeas cases brought under 28 U.S.C. § 2254 involving *state* – not federal –  prisoners. *See Moore v. Czerniak*, 574 F.3d 1092, 1094 (9th Cir. 2009); *Cobbs v. McGraff*, 2007 WL

801053 (N.D. Cal. 2007).[5]  Baptista has cited no § 2255 cases, and the court is aware of none, which would require Baptista's release from custody under the circumstances presented here.

Instead, the court VACATES Baptista's sentence under § 2255 and ORDERS the parties to appear on **March 16, 2011, at 1:30 p.m.** for a status conference before this court.  At that time, the court will advise Baptista regarding the consequences of withdrawing his guilty plea, including the potential reinstatement of the three felony counts that were dismissed and the potential for the government to file an information charging his prior conviction(s) under § 851, which had not previously been filed.  After Baptista has been apprised of the consequences of starting over, he will be given an opportunity to elect whether he wishes to withdraw his guilty plea or simply be resentenced.

**IT IS SO ORDERED.**

Dated:   February 23, 2011

_____
PHYLLIS J. HAMILTON
United States District Judge

---

[5] Moreover, the United States Supreme Court very recently reversed the Ninth Circuit's decision in *Moore*, in *Premo v. Moore*, 131 S.Ct. 733 (2011).